IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | |
| | * | Criminal No. 21-0432-BAH |
| WILLIAM RASHEEM JAMAL RICH, | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Defendant William Rasheem Jamal Rich has been charged with five counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of theft of government property in violation of 18 U.S.C. § 641. ECF 14, at 5–7. The Defense filed a motion in limine seeking to suppress Mr. Rich's October 13, 2021, statement. ECF 71. The Government opposes the motion. ECF 77. I have reviewed all relevant filings, and I held a hearing on this motion on May 9, 2024. ECF 80. Accordingly, for the reasons stated below, the Defense's motion in limine to suppress Mr. Rich's statement, ECF 71, is **DENIED**.[1]

**I.      BACKGROUND**

Mr. Rich moves to suppress a statement made to federal agents after his arrest on October 13, 2021. ECF 71, at 1. It is undisputed that Mr. Rich was in custody and not free to leave at the time he made this statement.[2] *See* ECF 77, at 9 (Government's acknowledgment that Mr. Rich was arrested on October 13, 2021, and that he was in handcuffs at the time of the interview). I

---

[1] The Defense's original version of this motion, ECF 70, is **DENIED as moot** as it is supplanted by ECF 71.

[2] In addition to the support offered by the filings, this observation is also supported by statements made by counsel at the May 9, 2024, hearing. Any references in this opinion to facts not cited in the record are based on my impressions from the May 9, 2024, hearing.

have reviewed the interview transcripts provided by the Defense as an exhibit. *See* ECFs 71-1, 71-2. The transcripts reflect that Special Agents Brian Maddox and Felix Beltran with the Office of the Inspector General at the Department of Veterans Affairs began the interview with Mr. Rich at 7:01 AM, and Mr. Rich apparently asked for counsel within the first few minutes of the interview. ECF 71-1, at 1–2 (showing that interview began at 7:01 AM); *id.* at 3 (showing that Mr. Rich asked, "[C]an I get an attorney?" shortly after beginning the interview). According to the record, the interview then ended. *Id.* at 3 (showing that Agent Maddox stated, "[W]e'll end the interview" at 7:04 AM after Mr. Rich requested an attorney). At 7:15 AM, the Government contends that Mr. Rich asked to speak with the agents again, and they interviewed him until 8:05 AM. ECF 71-2, at 1–2 (showing that interview resumed at 7:15 AM); *id.* at 17 (showing that Agent Maddox reported it was 8:05 AM when the interview ended). The transcript implies that Mr. Rich was advised of his rights before the interview began and includes a recitation of his rights during the interview, including the right to remain silent, the admonition that anything Mr. Rich said could be used against him in Court, the right to consult with counsel and to have counsel present during questioning, the right to have a lawyer appointed, and the right to stop answering questions at any time. ECF 71-1, at 2. Mr. Rich then formally acknowledged that knew his rights and waived them. *Id.*

According to the transcript, Mr. Rich quickly qualified his waiver by saying that his wish to speak with the agents "[d]epends on what this is," seemingly indicating that his desire to speak was contingent on the questions the agents asked him. ECF 71-1, at 2. The agents rightly told Mr. Rich that he could stop answering questions at any time, but that he needed to be "all in or all out." *Id.* Mr. Rich noted that at "any given time [he] can plead the fifth," showing some familiarity with the term and how it is used. *Id.* The agents again affirmed that he could stop at any time. *Id.*

They also advise him that they are federal agents and he could not lie to them, and Mr. Rich responded by asking for an attorney because "he d[idn't] feel safe." *Id.* at 2–3. The interview then ended at 7:04. *Id.* at 3.

The interview re-started again at 7:15 with yet another advisement of rights and another agreement by Mr. Rich that he understood his rights. ECF 71-2, at 2. Mr. Rich had a chance to review the search warrant and arrest warrant, and he agreed to answer questions. *Id.* He was again advised to tell the truth and not lie. *Id.* at 2–3. The agents and Mr. Rich spoke for a while, and eventually Mr. Rich was shown videos that appeared to show him walking at Sam's Club and at the gym. *Id.* at 7. He admitted that statements made in his compensation pension examinations were not accurate. *Id.* at 8. He was given water a few times. *Id.* at 6, 9. His handcuffs were adjusted. *Id.* at 10. The interview ended at 8:05 AM. *Id.* at 17.

Mr. Rich does not dispute the content of the transcripts, but instead insists that the transcripts and recordings leave out important information. Specifically, Mr. Rich testified at the hearing that one of the agents that conducted his interview, Agent Beltran, reapproached him after he invoked his right to counsel, threatened him, and told him to continue the interview. He also claimed at the hearing that he did not receive any *Miranda* warnings prior to the interview.

Mr. Rich raises three arguments in support of suppression: first, he claims the statement was obtained in violation of his Fifth Amendment Right against self-incrimination; second, he claims the statement was obtained in violation of his Sixth Amendment right to counsel;[3] and third, he claims the statement was "involuntary." ECF 71, at 2–4.

---

[3] I am not entirely convinced that the Sixth Amendment right to counsel had attached at the time of this interview, as formal proceedings had not yet begun since Mr. Rich had not yet appeared in court for any proceeding. *See Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 194 (2008) ("This Court has held that the right to counsel guaranteed by the Sixth Amendment applies at the first

## II.     LEGAL STANDARDS

The Fifth Amendment to the Constitution guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The right to have counsel . . . is indispensable to the protection of the Fifth Amendment privilege." *Miranda v. Arizona*, 384 U.S. 436, 469 (1966). The privilege against compulsory self-incrimination is safeguarded by procedural rules dictating the terms of custodial interrogations. *See id.* at 444. These rules require law enforcement officers to warn a suspect of his rights and to obtain a waiver of those rights before conducting custodial interrogation, with limited exceptions that are not applicable here. *See United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005).

Any waiver of the rights protected by a *Miranda* warning must be "knowing and intelligent" to be valid. *Miranda*, 384 U.S. at 492. To be a knowing and intelligent waiver, "'the

---

appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.").

The Sixth Amendment right to counsel guarantees a criminal defendant "the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). "Interrogation by the State is such a stage." *Id.* However, this right only attaches when adversarial judicial proceedings commence "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Texas v. Cobb*, 532 U.S. 162, 167–68 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)); *see also Moran v. Burbine*, 475 U.S. 412, 430 ("[I]t becomes applicable only when the government's role shifts from investigation to accusation.").

The Supreme Court has held that even after the Sixth Amendment right to counsel attaches, the fact "that [a defendant] had such a right at the time of his questioning, does not distinguish him from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned." *Patterson v. Illinois*, 487 U.S. 285, 290–91 (1988). Building on that logic, the Fourth Circuit has held that a regular *Miranda* warning suffices to protect a defendant's Sixth Amendment rights. *United States v. Muca*, 945 F.2d 88, 89 (4th Cir. 1991) ("After considering the opinions of our sister circuits, and the reasoning behind the Supreme Court's opinion in *Patterson*, we believe that the *Miranda* warnings given Muca were sufficient to advise him of his postindictment Sixth Amendment right to counsel."). As such, a proper *Miranda* warning would have adequately advised Mr. Rich of his Sixth Amendment right to counsel in any case.

4

waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To show that a waiver is voluntary, the government must show that the waiver of rights is the "product of free and deliberate choice rather than intimidation, coercion, or deception." *Id.* A statement that follows *Miranda* warnings will "[r]arely" be deemed involuntary. *Dickerson v. United States*, 530 U.S. 428, 444 (2000).

Here, the parties appear to agree Mr. Rich was in custody and subject to interrogation at the time of his statement. As a result, before the Court can admit his statement at trial, the Government must, at minimum, show that Mr. Rich was adequately advised of his rights and "voluntarily, knowingly, and intelligently" waived those rights.

In *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1984), the Supreme Court explained that "although we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, . . . additional safeguards are necessary when the accused asks for counsel." As such, the *Edwards* Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation, even if he has been advised of his rights." *Id.* at 484.

The Court continued by noting that "[a]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. *Edwards* set forth a "bright-line rule" that all questioning must cease after an accused requests counsel. *Solem v. Stumes*, 465 U.S. 638, 646 (1984).

As noted in *Smith v. Illinois*, this "'rigid' prophylactic rule embodies two distinct inquiries." 469 U.S. 91, 95 (1984) (citation omitted). "First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Id.* In *Maryland v. Shatzer*, 559 U.S. 98 (2010), the Supreme Court clarified this rule even more. "Under the rule in *Edwards*, a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." *Id.* at 105.

Here, there is no doubt Mr. Rich invoked his right to counsel. He said, "Okay, well in that case, can I get an attorney?" ECF 71-1, at 3. This was followed by a question from the agents, "You'd like to speak with a lawyer?" and Mr. Rich's response, "Yeah," after which questioning stopped at 7:04. *Id.* It restarted again at 7:15 AM. ECF 71-2, at 2. The question, then, is what happened between 7:04 AM and 7:15 AM, and whether Mr. Rich voluntarily initiated further communication and conversation with the agents. Indeed, the Government conceded at the hearing that this inquiry governs the instant motion, agreeing that if an agent reengaged with Mr. Rich after he invoked his right to counsel, before Mr. Rich approached the officers, it would be a violation of Mr. Rich's rights.

### III. **DISCUSSION**

I will first address the credibility of Mr. Rich's testimony at the hearing on this motion, as it heavily impacts the analysis of the challenges at issue here. I do not find Mr. Rich's testimony that Agent Beltran reengaged him and threatened him between 7:04 AM and 7:15 AM to be credible. This is not a determination I take lightly. In reaching this conclusion, I considered Mr.

Rich's demeanor, his mannerisms, the content of his testimony, and the context in which the testimony arose. I note that Mr. Rich offered no corroborating evidence for his testimony, and that there is no indication that he had ever raised similar concerns at any previous time during the nearly three-year history of this case. I was also struck by Mr. Rich's continued insistence that he received no *Miranda* warnings prior to the beginning of the recorded interview, despite several references to such warnings in the transcripts of the interviews, including acknowledgment of those prior Miranda warnings by Mr. Rich himself during the interview. *See* ECF 71-1, at 2 ("SA Maddox: Veteran William Rich, uh, has been advised of his *Miranda* rights . . . . So we talked about this while you were in the vehicle, but the acknowledgment is that you have read and you understand this statement and that you understand what your rights are . . . ."); *id.* (showing that Mr. Rich responded "I do" after Agent Maddox's summary of his *Miranda* rights, including the statement that he had been advised of those rights earlier in the car, and asking if Mr. Rich understood). Mr. Rich's demeanor and mannerisms during his testimony further undermined his credibility. While none of these factors would independently necessarily lead to a finding that the testimony was not credible, the cumulative effect is undeniable. Mr. Rich's testimony at the hearing will not be credited.

    A.    **Mr. Rich was properly Mirandized.**

A review of the record here shows that Mr. Rich was advised of his rights three times before waiving them orally and agreeing to speak to the agents. *See* ECF 71-2, at 2 ("[L]et's go through your advisement of rights real quick again, so this is the third time."); id. (showing that Mr. Rich responded, "I do," and, "Uh, yes," after he was asked if he understood his rights and wanted to speak with the agents). He was told of the ramifications of speaking to police. *Id.* at 2–3. The record indicates that he clearly understood his rights since he invoked them once and quite literally saw that questioning could, and would, stop. *See* ECF 71-1, at 3. He asked follow-up

questions about his rights and got honest, accurate answers. *See* ECF 71-2, at 2 (showing Mr. Rich asking questions about how to obtain a lawyer, including whether his family could call one for him, and the agents' responses). He was told repeatedly that he did not have to speak with agents. ECF 71-1, at 2; ECF 71-2, at 2. He was told that he could not lie but was also that he could stop at any time. ECF 71-1, at 2; ECF 71-2, at 2–3. Mr. Rich is not a young man, and he had no mental health condition that impeded his ability to understand what he was doing. He also was not under the influence of drugs or alcohol, and even noted throughout the interview that he does not do those things. *See* ECF 71-2, at 8 ("I'm not out here partying. I'm not doing drugs."). There were no language issues, and the officers repeatedly properly confirmed his waiver. *See* ECF 71-1, at 2; ECF 71-2, at 2.

And though his waiver was oral, it was sufficient. "To effectuate a waiver of one's *Miranda* rights, a suspect need not utter any particular words." *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000). "A suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then subsequently is willing to answer questions." *United States v. Umaña*, 750 F.3d 320, 344 (4th Cir. 2014).

Here, the record reflects Mr. Rich was affirmatively asked if he was "willing to waive these rights to answer questions freely and voluntarily." ECF 71-1, at 2; ECF 71-2, at 2. He affirmed that "[n]o promises or threats ha[d] been made to [him], and no pressure or coercion of any kind ha[d] been used against [him]." ECF 71-1, at 2; ECF 71-2, at 2. When asked to "confirm for the recording" that he understood his rights, Mr. Rich replied, "I do." ECF 71-2, at 2. When he was asked if he wanted to speak with the agents, he replied, "Uh, yes." *Id.*

Mr. Rich was properly advised of his *Miranda* rights and validly waived those rights. There was no violation of his Fifth Amendment right to be free from self-incrimination.

### B. Mr. Rich's request for counsel was scrupulously respected.

As soon as Mr. Rich indicated he wished to consult with counsel, Agent Maddox immediately ceased the interview and left the room. ECF 71-1, at 3. Mr. Rich was left alone in the basement with Agent Beltran. Having determined that Mr. Rich's testimony is not credible, the only testimony as to what occurred during that brief period of time when Mr. Rich was alone with Agent Beltran is Agent Beltran's testimony that he did not speak to Mr. Rich at all during that time. As such, the agents did not speak to Mr. Rich again until he initiated contact with them and expressed a desire to speak with them. Mr. Rich's right to counsel was not violated.

### C. Mr. Rich's statement was voluntary.

As to voluntariness, the Fourth Circuit has said that "[t]he test for determining whether a statement is involuntary under the Due Process Clause is whether the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* (internal quotation marks omitted).

In particular, a court must consider "whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *United States v. Whitfield*, 695 F.3d 288, 301 (4th Cir. 2012) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)). In addition, "[p]loys to mislead a suspect or lull him into a false sense of security" are not per se unconstitutional. *United States v. Giddins*, 858 F.3d 870, 883 (4th Cir. 2017) (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). "Indeed, there is 'no duty to advise [a defendant] of the identity of the specific offense

9

under investigation.'" *Id.* (quoting *United States v. Braxton*, 112 F.3d 777, 784 (4th Cir. 2017)). Finally, I note that "coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

Here, the record reflects that Mr. Rich's will was not overborne, notwithstanding his oral testimony at the hearing. His capacity for self-determinations was not critically impaired. He was alert, he understood the charges against him to some degree having been afforded a chance to review the warrants, and he had an idea of the subject matter he was questioned about. He was not duped, lied to, or tricked. He was not threatened, and no promises were made to him other than the promise to "present the information" and the continued requirement that he "be honest and forthright." ECF 71-2, at 8. He was given water and his handcuffs were adjusted. *Id.* at 6, 9–10. There is simply no evidence of police coercion here. As a result, there is no basis to conclude that Mr. Rich's will was "overborne or his capacity for self-determination critically impaired," and I find that Mr. Rich's statement was voluntary.

### IV.   CONCLUSION

For the foregoing reasons, Mr. Rich's motion in limine to suppress Mr. Rich's statement, ECF 71, is **DENIED**.

A separate implementing Order will issue.


Dated: May 23, 2024                               /s/
                                         Brendan A. Hurson
                                         United States District Judge